UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICHARD CARPENTER,          )
          )
          Plaintiff,      )
          )
        v.         )     No.  4:07CV1611 DJS
          )          (TIA)
MICHAEL ASTRUE, Commissioner     )
of Social Security,       )
          )
         Defendant.     )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

## I.    Procedural History

On June 9, 2005, Claimant filed an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 54-56).[1] In the Disability Report Adult completed by Claimant and filed in conjunction with the application, Claimant stated that his disability began on May 20, 2005, due to knee problems, bunion, and diabetes. (Tr. 87-94). On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 34-37). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 32). On September 18, 2006, a hearing was held before an ALJ. (Tr. 211-34).

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer (Docket No. 6/filed November 26, 2007).

Claimant testified and was represented by counsel. (Id.). Thereafter, on November 13, 2006, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 10-16). After considering the contentions raised in the letter of Claimant's counsel and the summary of Claimant's medical history, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on July 13, 2007. (Tr. 3-6, 203-05, 208-10).[2] The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on September 18, 2006

#### 1.  Claimant's Testimony

At the hearing on September 18, 2006, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 211-34). Claimant testified that he lives alone in a mobile home on a lot he owns. (Tr. 216).

Claimant testified that he last worked as an auto body repair person. (Tr. 216). Prior to that work, Claimant worked at a steel warehouse in the late seventies and in the printing industry after high school graduation. (Tr. 216). Claimant filed for worker's compensation after his first and second knee operations in 1996 and 1997. (Tr. 217). In 1983, Claimant completed a course in auto body repair and painting at Metro Business College. (Tr. 60, 217).

Claimant testified that he applied for unemployment benefits after he lost his job in May,

---

[2]The undersigned interprets the Appeals Council's statement that the additional evidence did not provide a basis for changing the ALJ's decision a finding that Claimant's summary of his medical history was not material. *See* Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (whether additional evidence meets criteria is question of law; to be material, evidence must be relevant to claimant's condition for time period for which benefits were denied, and must not merely detail after-acquired conditions or post-decision deterioration of pre-existing condition).

2005. (Tr. 218). The ALJ noted that Claimant had been awarded unemployment benefits through the fourth quarter of 2005 and questioned the inconsistency in presenting himself as ready, willing and able to work to the State of Missouri for unemployment benefits while at the same time seeking benefits as of May, 2005, for total disability. (Tr. 219). Claimant acknowledged the inconsistency in his testimony and how this would reflect on his credibility. (Tr. 219).

Claimant testified that his physical impairments include a knee replacement on January 5, 2005, and three other knee operations in 1996-97. (Tr. 220-21). Claimant also has been diagnosed with arthritis and bursitis by Dr. Kramer in early 2006. (Tr. 221-22). Dr. Kramer treated Claimant for his continued knee problems and diagnosed Claimant with mild underlying degenerative arthritis and determined Claimant's condition could be controlled with anti-inflammatory medication. (Tr. 222-23). In the mid-seventies, Claimant experienced disc problems in his back and was treated with medication and rest. (Tr. 223). Claimant testified that he reported his back problems to Dr. Greco during treatment. (Tr. 224). The ALJ noted that the medical records reflect that the last time Claimant received treatment for a lumbar issue was in 2000, when he was diagnosed with mild degenerative changes. Claimant was diagnosed with diabetes in January, 2005, and currently is not taking medication but controlling his diabetes through diet and exercise due to no medical coverage. (Tr. 224). Claimant testified that he is depressed because of the knee replacement surgery and his troubles, but he has never been diagnosed with depression. (Tr. 225). Dr. Greco diagnosed Claimant with anxiety, and Claimant takes Alprozolam. (Tr. 225). Claimant testified that he has never been treated by a psychiatrist or a psychologist. (Tr. 226). Claimant takes pain medication but the medicine makes him dizzy and sleepy. (Tr. 231). Claimant rated his pain after taking medication as a four on a scale of one

to ten with one being he barely experiences pain and ten being the pain is so bad he seeks treatment at the hospital. (Tr. 232).

As to his daily activities, Claimant cooks his meals, feeds the dog, and walks around a quarter of a mile. (Tr. 225). Walking too far causes his knees to flare up and walking on concrete causes Claimant problems. (Tr. 225, 227). Claimant has problems falling asleep and sleeping and takes an over-the-counter sleep aid. (Tr. 227, 232). Claimant cleans on occasion and does the laundry. (Tr. 227). Claimant goes to the grocery store to buy food once a week. (Tr. 227). Claimant is able to groom himself and handle the household finances. (Tr. 229-30). Claimant used to ride his motorcycle and do target shooting at the rifle range before his knee replacement surgery, but because of the walking and the vibration, both activities are difficult for him now. (Tr. 228). Claimant sees his parents once a month and his daughters every couple of months. (Tr. 229). Claimant communicates with his daughters via e-mail. (Tr. 230).

Claimant testified that he can sit for fifteen to twenty minutes before getting up and sitting for forty-five minutes would be the longest time he could sit. (Tr. 231). Claimant can stand for thirty minutes but if on concrete, only fifteen to twenty minutes. Claimant can carry twenty to twenty-five pounds. Claimant carries bags of groceries up the steps of his mobile home. (Tr. 231).

Claimant described the severe clunk he experiences in his knee after he has been walking and how the clunk aggravates the pain. (Tr. 232). At the beginning of the hearing, the ALJ refused to admit a videotape offered by counsel. (Tr. 214). Claimant testified that on the videotape you can hear the clunking sound made by his knee. (Tr. 232). Claimant testified that he reported the clunking noise to the original surgeon, but he would not acknowledge what

Claimant reported to him.  (Tr. 232).  Claimant testified that he also reported the problem to the two other surgeons, and after examining him, the surgeons did not know what was wrong with him, and directed Claimant to return to the original surgeon for treatment.  (Tr. 232-33).

### 2.  Open Record

During the hearing finding that counsel submitted ten pages of incomplete medical records, the ALJ determined that the record needed to be further developed and stated that the record would be held open for two weeks so that Claimant's counsel could submit complete records for Exhibits F-78 through F-66.  (Tr. 215, 232).  A review of the record shows that counsel timely submitted additional evidence to the ALJ before he issued a decision denying Claimant's claims for benefits as directed by the ALJ.  (Tr. 95-109).

### 3.  Claimant's Medical History Summary

Claimant outlines his medical history starting in 1996 when he injured his knee in fall at work.  (Tr. 203).  After the total knee replacement surgery, Claimant noticed a severe clunking noise in his replaced knee.  Claimant contends that he reported the clunking problem to Dr. Burke, but Dr. Burke would not acknowledge his complaints and told Claimant to live with the noise.  Claimant outlines his medical treatment by Dr. Greco, Dr. Kramer, Dr. Williams, and Dr. Schultz, a neurologist.[3]  Claimant also references his lack of medical insurance since the beginning

---

[3]The undersigned notes that there are no medical records in the transcript of any treatment notes or evaluation by Dr. Schultz or a neurologist.  Nonetheless, Claimant outlined treatment by Dr. Schultz in his Medical History.  (Tr. 204).  *See* Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).  The record before the undersigned is devoid of any records from Dr. Schultz or a neurologist.

of June, 2006.[4]  (Tr. 204).

### 4. Forms Completed by Claimant

In the Function Report-Adult, Claimant reported his daily activities to include personal

care, watching television with his leg elevated, taking medications for pain and depression, and

taking a nap.  (Tr. 79).  Claimant reported mowing the lawn on a riding mower, doing the

laundry, and a little cleaning.   (Tr. 80).  Claimant drives although he reported problems getting

out of his truck.  (Tr. 80-81).  Claimant goes grocery shopping every other week for small

amounts at a time.  (Tr. 81).  Claimant reported sitting for a long time causes his knee to lock up.

(Tr. 83).

In the Pain Questionnaire dated June 27, 2005, Claimant listed Hydrocodone and

---

[4]Although Claimant asserts in the Medical History and testified at the hearing he could not afford medical treatment due to lack of finances and insurance, the record is devoid of any evidence suggesting that Claimant sought any treatment offered to indigents.  See Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992)(holding the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992)(noting that financial hardships can be considered in determining whether to award benefits; however, that is not of itself determinative.  The court found compelling that plaintiff presented no evidence she sought out low-cost medical treatment, or was denied treatment due to lack of finances).  The record does not document that Claimant was ever refused treatment due to insufficient funds.  See Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiff's case is buttressed by evidence he related of an inability to afford prescriptions and denial of the medication); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) ("Although [claimant] claims he could not afford such medication, there is no evidence to suggest that he sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication."  If a claimant is unable to follow a prescribed regimen of medication and therapy to combat his difficulties because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits.  Murphy, 953 F.2d at 386.  The fact that a claimant is under financial strain, however, is not determinative.  Id.  A claimant's alleged failure to seek treatment due to financial difficulties in not credible when the claimant did not attempt to obtain any low-cost medical treatment.  Id. at 386-87.  Here, as the ALJ points out, the record is devoid of any evidence showing that Claimant was denied treatment due to lack of finances or that he attempted to obtain low-cost treatment.

Naproxen as his medications and indicated that he does not experience any side effects from the medications. (Tr. 84). Claimant noted that his left knee clunks with each step he takes, and he still takes pain medication. (Tr. 85). Claimant noted trouble with every day activities even simple ones. (Tr. 85).

In the Adult Disability Report dated February 9, 2006, Claimant reported becoming unable to work because of his problems with his knee, bunion, and diabetes since May 20, 2005. (Tr. 87-88). Claimant noted that his conditions first started bothering him in 1997, but he continued to work until May 29, 2005, when he was released from work by his employer. (Tr. 88). Claimant worked as a repairman in an auto body shop. (Tr. 88). Claimant listed Alegra D (allergies), Alprozolam (mild depression), Amoxicillin, Lipitor (high cholesterol), Mydrocodone (pain), and Naproxen (pain relief) as his medications. (Tr. 92).

## III.    Medical Records

On December 22, 1997, Claimant underwent a left knee arthroscopic examination at St. Luke's West Hospital. (Tr. 202A). Dr. Edward Schlafly noted no instability and the patellofemoral looked good. Dr. Schlafly debrided the infrapatellar and medial peripatellar synovitis. Dr. Schlafly also debrided the articular cartilage on the medial femoral condyle. Claimant tolerated the procedure well. Claimant returned for an office visit on December 29, 1997, and reported doing well and encouraged by his progress. Examination revealed an excellent range of motion , a trace of effusion, healing incisions, and no signs of infection or DVT. Dr. Schlafly recommended that Claimant continue his range of motion and strengthening exercises. Dr. Schlafly noted that Claimant remains disabled from work until he returned for reexamination on January 9, 1998. (Tr. 202A).

In a letter dated January 9, 1998, Dr. Schlafly noted how he reexamined Claimant, and Claimant reported doing well. (Tr. 202). Claimant reported his knee tremendously improving since the surgery although his knee still pops and makes noise. His knee does not hurt, and he can bend and straighten his knee without pain. Dr. Schlafly gave Claimant clearance to return to regular duty work effective January 19, 1998. (Tr. 202).

Dr. Thomas Greco first started treating Claimant for low back pain, anxiety, and diabetes on February 2, 2000. (Tr. 151). Dr. Greco diagnosed Claimant with mild degenerative changes in the lower spine on February 7, 2000. (Tr. 151). In a follow-up visit on March 8, 2000, Claimant reported his anxiety being better and controlled by the Xanax prescription. (Tr. 150).

On July 23, 2002, Dr. Greco refilled Claimant's Xanax prescription. (Tr. 106, 135).

In a physical examination on October 3, 2002, Claimant reported joint stiffness. (Tr. 148). Dr. Greco found Claimant to have anxiety. Claimant reported not taking any daily medications at that time. (Tr. 148).

On January 6, 2003, Dr. Greco prescribed Claimant Naprosyn and Vicodin. (Tr. 104-05, 133-34). In an office visit on January 9, 2003, Claimant reported that his anxiety to be controlled by medication. (Tr. 146).

On April 6, 2003, Dr. Greco prescribed Claimant Hydrocodone. (Tr. 97).

On April 12, 2004, Dr. Greco prescribed Claimant Vicodin and Naproxen. (Tr. 99-100, 128-29). At the six month checkup with Dr. Greco as follow-up treatment for his low back pain, high blood pressure, and rhinitis, Claimant reported no complaints. (Tr. 145). Dr. Greco refilled his Lipitor prescription. (Tr. 144).

On April 14, 2003, Dr. Greco prescribed Claimant Lipitor and Xanax. (Tr. 101-02, 130).

During the physical examination on August 10, 2004, Claimant reported persistent low back pain. (Tr. 142). Dr. Greco listed Lipitor, Vicodin, Naproxen, and Allegra D as Claimant's medications. (Tr. 142). Dr. Greco determined to recommend Claimant to an orthopedist for treatment of his low back pain. (Tr. 143).

On October 8, 2004, Claimant returned to Dr. Greco's office and reported severe pain in his knee and no relief from a cortisone injection. (Tr. 141). Examination revealed tenderness of left knee. (Tr. 141). On December 14, 2004, Dr. Greco refilled Claimant's Vicodin prescription at Claimant's request. (Tr. 140). On December 21, 2004, Dr. Greco faxed clearance for knee replacement surgery to Dr. Burke. (Tr. 140).

In the initial visit on referral by Dr. Greco for evaluation, Dr. James Burke, an orthopedist, Claimant reported twisting his knee while walking in September, 2004. (Tr. 180). Claimant experienced a significant pop, his knee gave way and started to swell. Claimant reported two previous knee surgeries about one year apart in 1998. Examination of his left knee showed a 5 degree genu varum deformity with a range of motion negative 5 degrees to 125 degrees. Dr. Burke noted reproducible tenderness about his medial joint line but no lateral joint line tenderness. Dr. Burke further noted Claimant had some pain with loading of the medial compartment on range of motion and no varus or valgus instability. A review of Claimant's x-rays revealed bone-on-bone medial compartment arthritis and significant chondromalacia on the associated medial femoral condyle. (Tr. 180). As treatment, Dr. Burke administered a cortisone shot to provide relief for his knee pain. (Tr. 179). Dr. Burke opined that if no significant relief is provided by the injection, he would recommend a partial versus a total joint replacement. (Tr. 179).

In a follow-up visit on December 17, 2004, with Dr. Burke, Claimant reported relief for

two days after his injection.  (Tr. 179).  Claimant reported his bone-on-bone medial compartment arthritis significantly bothering him, and expressed willingness to proceed with total knee replacement surgery.  Examination revealed bone-on-bone medial compartment arthritis unresponsive to conservative treatment.  Dr. Burke determined to schedule Claimant for the surgery at his convenience.  (Tr. 179).

On January 5, 2005, Claimant underwent a left total knee replacement surgery performed by Dr. Burke after conservative care did not alleviate Claimant's pain.  (Tr. 179, 181, 184, 198-200).  Dr. Burke noted that the procedure went well.  (Tr. 179, 183).  Claimant's discharge diagnosis was degenerative joint disease right knee.  (Tr. 184).  The diagnostic x-ray revealed three compartments osteoarthritic changes with significant joint space narrowing particularly in the medial compartment and mild varus angulation.  (Tr. 197).

In the follow-up visit on January 24, 2005, Dr. Burke noted how the therapist informed him that Claimant was never home when the therapist came to do physical therapy, and Claimant had been somewhat noncompliant.  (Tr. 178).  Based on Claimant's noncompliance with therapy, Dr. Burke contacted Claimant and asked him to come for an early checkup visit.  Examination revealed a range of motion from negative 8 degrees to 75 degrees.  Dr. Burke found no varus or valgus instability and noted that Claimant ambulated without an assistance device.  The x-ray showed that the total knee replacement to be in the expected position.  Because Claimant was stiff from where Dr. Burke thought he should have been, Dr. Burke determined to schedule Claimant for a surgical manipulation of the left knee and thereafter have Claimant comply with physical therapy.  On January 27, 2005, Dr. Burke performed the left knee manipulation.  Dr. Burke noted that preoperatively, Claimant had a range of motion from negative 5 to only 50 degrees.  Dr.

Burke noted that during the manipulation, he could feel marked release of some adhesions in the suprapatellar pouch. Dr. Burke passively achieved 130 degrees. Dr. Burke thought Claimant should do well if he complied with aggressive physical therapy. (Tr. 178).

On February 10, 2005, Claimant returned for follow-up treatment after the knee manipulation. (Tr. 178). Examination revealed a range of motion from negative 12 degrees to 100 degrees with ease. (Tr. 177). Dr. Burke noted no varus or valgus instability. Dr. Burke noted that Claimant was doing very well, and he would continue his range of motion therapy at home. Dr. Burke wrote a prescription for Vicodin and gave Claimant a knee stabilizer to wear at nighttime. Dr. Burke determined that Claimant could return to work on February 14, 2005. (Tr. 177).

In a Dr. Burke follow-up visit on March 10, 2005, after knee manipulation six weeks earlier, Claimant reported marked improvement after therapy. (Tr. 123, 177). Claimant's therapy notes showed a range of motion from 0 to 110 degrees. Examination revealed a range of motion from negative 3 to 105 degrees with no varus or valgus instability. Dr. Burke noted that Claimant continued to work full duty. (Tr. 123, 176-77). Claimant indicated that he wanted to try continuing therapy on his own. (Tr. 123, 176-77).

On April 6, 2005, Dr. Greco prescribed Claimant Hydrocodone. (Tr. 126)

In a follow-up visit with Dr. Greco on June 8, 2005, Claimant reported severe knee and back pain as well as bunion pain. (Tr. 139). Claimant reported that his last day of work was May 20, 2005. Dr. Greco determined to refer Claimant to a podiatrist and an orthopedist as treatment. (Tr. 139).

In consultation at the request of Dr. Greco, Dr. Robert Kramer evaluated Claimant's

bilateral knee discomfort on September 22, 2005. (Tr. 118). Claimant reported having a left total

knee replacement performed by Dr. Burke on January 5, 2005, and experiencing persistent pain

and swelling in the left knee and taking pain medications for his discomfort. Claimant reported

not working in the last several months because he was laid off from his job. Dr. Kramer noted a

history of diabetes. Physical examination of Claimant's right knee revealed full extension and

flexion to 130 degrees with some medial joint line tenderness but no lateral joint tenderness, and

no evidence of effusion. Dr. Kramer determined that Claimant's knee to be stable to varus and

valgus stress. (Tr. 118). Examination of Claimant's left knee revealed a lack of 2 degrees soft

full extension, flexion to 95 degrees, and a trace effusion. (Tr. 119). Dr. Kramer diagnosed

Claimant with right knee pain and left knee pain status post left total knee arthroplasty. Because

of Claimant's complaints of right knee discomfort and the x-ray films not showing any significant

arthritis, Dr. Kramer recommended further diagnostic testing including a MRI of Claimant's right

knee. Dr. Kramer explained to Claimant that the x-rays of his left knee showed the cemented

total knee replacement to be in good position without any evidence of loosening. Dr. Kramer also

recommended follow-up treatment with Dr. Burke with treatment possibly including aspiration of

the left knee to rule out a low-grade infection causing his persistent discomfort. Dr. Kramer

noted that after the MRI, he would then recommend possible further treatment concerning

Claimant's right knee. (Tr. 119).

In the consultation report dated September 29, 2005, Dr. Douglas Curry, a radiologist at

Missouri Baptist Medical Center, interpreted the MRI reading of Claimant's right knee without

contrast. (Tr. 120). Dr. Curry determined that Claimant has increased signal in posterior horn of

the medial meniscus likely degenerative, mild osteoarthritis, and pes anserine bursitis. (Tr. 120).

The x-ray of Claimant's left knee showed cemented total arthoplasty to be in good position and overall alignment to be approximately 5 degrees of valgus. (Tr. 121).

In a follow-up visit on October 14, 2005, Claimant reported continued discomfort in his right knee. (Tr. 117). The MRI showed increased signal in the posterior horn of the medial meniscus most likely degenerative rather than meniscal tear, mild osteoarthritis, and pes anserine bursitis. Physical examination revealed full extension and flexion to 130 degrees of the right knee, some mild medial joint line tenderness, no lateral joint tenderness, and some mild tenderness over the pes anserine bursitis. Dr. Kramer noted that Claimant's right knee is stable to varus and valgus stress. Dr. Kramer diagnosed Claimant with right knee mild degenerative arthritis and determined the symptoms should be controlled with anti-inflammatory medication as needed. (Tr. 117).

On January 19, 2006, Dr. Joseph Williams treated Claimant for left knee pain. (Tr. 112). Claimant reported having a left knee total knee replacement one year earlier by Dr. James Burke.[5] Claimant complained of continued knee pain since the surgery. Claimant reported a knee knocking sound whenever he walks. Claimant reported being released from work because of his constant pain and inability to do tasks he used to be able to do. Physical examination revealed some chronic swelling in the left knee and a range of motion from about 5 degrees to 100 degrees. Dr. Williams diagnosed Claimant with status-post painful left total knee replacement and recommended Claimant obtain a whole body bone scan to determine "if there is something wrong with his knee." (Tr. 112). The bone scan revealed probable degenerative changes in Claimant's right side of L5. In addition, the radiologist noted some abnormal uptake around the femoral and

---

[5]The treatment note incorrectly lists Dr. Brooks, not Dr. Burke, as the surgeon who performed the total knee replacement surgery.

tibial components from the left knee replacement and within the normal limits one year following such surgery.  (Tr. 113).

In the Physical Residual Functional Capacity Assessment completed on September 8, 2006, Danele Gilmore, a senior counselor for Disability Determinations, listed osteoarthritis knee as Claimant's primary diagnosis.  (Tr. 66-73).  Ms. Gilmore indicated that Claimant can occasionally lift twenty pounds, frequently lift ten pounds, and stand and sit about six hours in an eight-hour workday.  (Tr. 67).  Ms. Gilmore noted that Claimant has unlimited capacity to push and/or pull.  (Tr. 67).  With respect to postural limitations, Ms. Gilmore indicated that Claimant can never climb ladders/ropes/scaffolds, occasionally climb ramps/stairs, stoop, kneel, and crouch, and frequently balance and crawl.  (Tr. 68).  Ms. Gilmore noted that Claimant has no established manipulative, visual, communicative, or environmental limitations.  (Tr. 69-70).  In support, Ms. Gilmore noted how Claimant has returned to work and his allegations are partially credible.  (Tr. 71).  There is no treating or examining source statement regarding Claimant's physical capacities on the record.  (Tr. 72).  Ms. Gilmore noted how Dr. Greco treated Claimant's severe knee pain and osteoarthritis with a cortizone injection.  (Tr. 73).  A x-ray dated January, 2005, revealed three compartment osteoarthritic changes and degenerative joint disease of the right knee.  Ms. Gilmore noted that Dr. Burke authorized Claimant to return to full work duty on February 14, 2005, finding Claimant was doing well and his range of motion was 12 degrees to 100 degrees easily.  In a return visit in March, 2005, Claimant reported how therapy did wonders for him.  Dr. Burke noted Claimant's range of motion to be 0 to 110 degrees, and Claimant continuing to work full duty.  (Tr. 73).

In the Explanation of Determination dated September 16, 2005, a counselor for Disability

Determinations, opined as follows:

> The claimant is 51 years old with a high school education. He has a history of semi-skilled to skilled work as an auto repairer. Medical records reveal the claimant was released for full duty by his surgeon. An E3decision is not given because the claimant has improved greatly to the point of performing and going back to full duty at work. Additional evaluation is not necessary. There is insufficient evidence to support allegations of diabetes and bunions. The claimant's residual physical capacity is consistent with light work.

> His past job as an auto repairer is considered medium work. He is therefore returned to other work that is less demanding such as: furniture rental consultant (retail trade) 295.357-018, usher (amusement & recreation) 344.677-014, and counter clerk (photo finishing) 249.366-010.

(Tr. 33).

## IV.   The ALJ's Decision

The ALJ found that Claimant meets the disability insured status requirements through December 31, 2009. (Tr. 12). Claimant has not engaged in substantial gainful activity since May 20, 2005, the date Claimant alleges he became unable to work. The ALJ found that the medical evidence establishes that Claimant has the severe impairments of residuals of knee replacement surgery and mild depression, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 12). The ALJ found that Claimant's allegations of disabling symptoms precluding all substantial gainful activity are not consistent with the evidence and are not entirely credible for the following reasons. (Tr. 14). In the resume filed with the ALJ, Claimant indicated that his objective was full employment.[6] Next, at the hearing, Claimant testified that he continued working until November, 2005, but after the ALJ challenged his testimony, Claimant changed his testimony to having stopped working in

---

[6]Searching for work contradicts a claimant's allegations of disability precluding all work. Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

May, 2005.  Claimant acknowledged having filed for unemployment benefits after the alleged

onset date of disability and acknowledged the inconsistency in his testimony and how this would

reflect on his credibility.  (Tr. 14).  The ALJ observed that at the hearing Claimant was able "to sit

almost forty-five minutes with no visible signs of distress and no problems getting up from the

chair."  (Tr. 15).  Further, the ALJ noted how the record shows that Claimant did not seek

consistent medical treatment.  (Tr. 15).

The ALJ found that Claimant has had the residual functional capacity to perform work

that involves lifting up to ten pounds frequently and twenty pounds occasionally, walk and stand

approximately six hours in an eight-hour workday, and sit most of the time.  (Tr. 12).  Claimant

should perform no climbing, only occasionally climb ramps or stairs , stoop, kneel, or crawl.  The

ALJ determined that Claimant is unable to perform his past relevant work.  (Tr. 15).  Claimant has

the residual functional capacity to perform unskilled work at the light level.  (Tr. 12).  The ALJ

noted that Claimant is an individual closely approaching advanced age and has completed at least

a high school education.  (Tr. 15-16).  Considering Claimant's residual functional capacity and

vocational factors, the ALJ determined that the issue of whether Claimant has transferable skills is

not critical.  (Tr. 16).

Based on Claimant's residual functional capacity, his age, education, and work experience,

the ALJ opined that Claimant is not disabled.  (Tr. 16).  The ALJ noted that there are jobs that

exist in significant numbers in the national economy that a hypothetical individual with Claimant's

residual functional capacity could perform.  (Tr. 16).  The ALJ found Claimant is not under a

disability. (Tr. 16).

**V.     Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d). If the impairment is not listed or is

not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.       The medical evidence from treating and consulting physicians.

4.       The claimant's subjective complaints relating to
         exertional and non-exertional activities and impairments.

5.       Any corroboration by third parties of the
         claimant's impairments.

6.       The testimony of vocational experts when required which
         is based upon a proper hypothetical question which sets forth the claimant's
         impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

      In his application for disability benefits, Claimant alleged disability due to problems with

his knees, bunion, and diabetes.  The ALJ found Claimant has severe impairments of residuals of

knee replacement surgery and mild depression and concluded that the impairments, alone or in

combination, are not of listing level.  A review of Claimant's application shows that Claimant

failed to allege depression as a basis for disability.  Claimant did not testify at the hearing that his

depression affects his ability to function, and  the ALJ fulfilled her duty of investigating this claim

not presented in the application for benefits but for the first time, raised by Claimant during the

hearing. The undersigned concludes that the ALJ did not err in discounting the diagnosis of

depression/anxiety.  *See* Kirby v. Astrue, 500 F.3d 705, 707-09 (8th Cir. 2007) (impairment is not

severe if it is only slight abnormality that would not significantly limit mental ability to do basic

work activities; claimant bears the burden of establishing impairment's severity).  The ALJ opined

in her decision as follows: The medical records do not document that any treating physician has

ever found or imposed any long term, significant and adverse mental or physical limitations upon

the claimant's functional capacity.  (Tr. 14).

The Court finds no support anywhere in the record for Claimant's contention that the ALJ erred in failing to consider his depression as a severe impairment, and to determine its effect on his limitations. First, Claimant never alleged that his depression was disabling, and he presented no medical evidence substantiating such claim. Claimant never alleged any limitation in function as a result of his depression in his applications for benefits or during the hearing. Indeed, the medical record is devoid of any support. The record not only fails to contain substantial evidence to support such a claim, it contains virtually no evidence to support Claimant's argument. The ALJ is under "no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (quoting Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993)). Accordingly, this claim is without merit.

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in properly assessing the weight given to the medical evidence. Further the Claimant contends that the ALJ failed to properly assess Claimant's credibility regarding his subjective complaints of constant pain. Finally, Claimant contends that the ALJ failed to properly formulate his residual functional capacity

A.    Weight Given to Medical Opinions and Residual Functional Capacity

Claimant contends that the ALJ erred by not giving appropriate weight to Claimant's treating doctors' opinions and restrictions when determining his residual functional capacity. See 20 C.F.R. § 404.1527(d)(2) (2005) (requiring the Commissioner to give controlling weight to the opinion of a treating physician if "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence");

Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003). When a treating source's opinion is not controlling, it is weighed by the same factors as any other medical opinion: the examining relationship, the treatment relationship, supporting explanations, consistency, specialization, and other factors. See 20 C.F.R. § 404.527(d). Claimant contends that the ALJ should have accorded more weight to the treating doctors' opinions and restrictions inasmuch as those physicians were his treating physicians.

The undersigned finds Claimant's argument flawed inasmuch as the instant medical record does not support his claim of disability. The medical record is devoid of any physician finding Claimant disabled or limited in his ability to function. The medical records show that Claimant's knee problems started in the late 1990's, but he continued to perform his heavy work in auto body repair until May, 2005. Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability). Indeed, at the hearing Claimant testified that he stopped working because he was laid off, not because of his impairments.[7]

After undergoing a left total replacement knee surgery in January, 2005, Claimant was

_____

[7]In the treatment note dated January 19, 2006, Claimant reported to Dr. Williams that he was released from work due to his constant pain and inability to do tasks he used to be able to do. This record is inconsistent with Claimant's hearing testimony regarding the reason why Claimant stopped working. Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).

noncompliant with therapy thereby requiring surgical manipulation to achieve the desirable range of motion and recovery. Six weeks after the total knee replacement surgery, Dr. Burke determined that Claimant could return to work, and two weeks later, Dr. Burke noted that Claimant continued to work full duty. A review of his treatment notes reveal that Dr. Burke never found Claimant to have any functional limitations with respect to sitting, standing, walking, lifting, twisting, stooping, crouching, or climbing. A review of his treatment notes show how Dr. Burke had never made any findings regarding Claimant's knees impacting his ability to work or imposed any work limitations. Thereafter, Drs. Kramer and Williams treated Claimant, but neither one imposed any work limitations. Indeed, the MRI results revealed degenerative changes, mild osteoarthritis, and bursitis, and Dr. Kramer opined that Claimant's symptoms should be controlled with anti-inflammatory medication. Despite Claimant's complaints of pain and knocking in his knee to Dr. Williams, a bone scan of his left knee revealed that his knee appeared to be within normal limits one year following the surgery. The medical records of Claimant's treating doctors do not contain clinical evidence of a disabling condition during the relevant time period or any restrictions imposed by the doctors.

As noted by the ALJ, the objective medical evidence does not support Claimant's alleged excessive functional limitations. Nor do the medical records show that any treating doctor "ever found or imposed any long term, significant and adverse mental, or physical limitations upon the claimant's functional capacity... His allegations to the contrary are not consistent with the evidence as a whole, persuasive or credible." (Tr. 14). The treatment notes show Claimant's knee condition to be stable, numerous examinations showing unremarkable results, and the total knee replacement to be in good position without any evidence of loosening. The ALJ gave good

reasons for her determinations, and such reasons are supported by substantial evidence on the record as a whole. Thus, the substantial evidence on the whole record supports the ALJ's findings.

With regard to the ALJ's determination of Claimant's RFC, the undersigned finds that the ALJ properly assessed the medical evidence and Claimant's credibility. Claimant relies on his hearing testimony regarding his impairments. "The ALJ must determine a claimant's RFC based on all of the relevant evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered." SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218. In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record

as a whole. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints. The ALJ must consider all of the evidence presented, including the claimant's prior work record and observations by third parties and treating and examining physicians as to:

    1.      the claimant's daily activities;

    2.      the duration, frequency and intensity of the pain;

    3.      any precipitating and aggravating factors;

    4.      dosage, effectiveness and side effects of medication; and

    5.      any functional restrictions.

Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190. 1193 (8th Cir. 1995). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003)

("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record." )

The ALJ's determination of Claimant's RFC is supported by substantial evidence in the record. Likewise, the ALJ noted several inconsistencies within the record, Claimant's testimony, and she pointed out the lack of supporting objective medical evidence. The ALJ opined that the medical record does not show that any physician imposed any functional restrictions of Claimant or found him to be totally disabled. Indeed, the ALJ highlighted the lack of documentation in the treatment records of restrictions upon Claimant's functional capacity ever placed on Claimant. The ALJ also properly considered the Polaski factors in concluding that Claimant's limitations as set out in the treatment and documentary record are less than fully credible, and Claimant's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Tr. 14). The ALJ listed facts from Claimant's hearing testimony regarding the Polaski factors and the medical record that reflected upon Claimant's ability to perform the full range of light work such as his daily activities of preparing his own meals, doing laundry and cleaning, mowing the grass on a riding mower, driving a car, shopping, visiting friends, and caring for his dog. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case). Those included Claimant's testimony at the hearing, the absence of objective medical evidence of deterioration, the absence of any doctor finding Claimant disabled or imposing any functional limitations, his failure to seek regular and sustained treatment, medical noncompliance, and his ability to sit for almost forty-five minutes during the hearing with no

visible signs of distress. Likewise, the ALJ found that Claimant's receipt of unemployment compensation benefits through 2005 to be inconsistent with his allegation of disability because receipt of such benefits requires that the individual is ready and able to work. *See* Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998) (applying for unemployment compensation is evidence negating a claimant's claim of disability). Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform the full range of light work. The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from her decision. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform a full range of light work. Thus, the undersigned finds that substantial evidence supports the ALJ's finding that Claimant could lift up to ten pounds frequently and twenty pounds occasionally; stand and walk approximately six hours in an eight-hour workday; sit for most of the time; occasionally climb ramp/stairs, stoop, kneel, crouch, or crawl; and never climb ladder/ropes/scaffolds. The ALJ thus concluded that Claimant would be able to meet the demands of unskilled work at the light level.

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

B.    Credibility Determination

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Instead, the ALJ must also consider all of the evidence relating to the Claimant's prior work history, the absence of objective medical evidence to support the complaints, and third party observations as to:

1. claimant's daily activities;

2. duration, frequency and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness and side effects of medication;

5. functional restrictions.

Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (stating factors from Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The ALJ may disbelieve the claimant's subjective complaints "if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

The undersigned recognizes that pain itself may be disabling. See Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994). However, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Jones, 86 F.3d at 826. "[T]he real issue is how severe the pain is." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)). While there is no

doubt that claimant experiences pain, the more important question is how severe the pain is. Gowell, 242 F.3d at 796.

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, his decision should be upheld. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1966). The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown, 87 F.3d at 966. The ALJ's credibility findings are entitled to deference if the findings are supported by multiple valid reasons. See Goff v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005); Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination).

In her decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing medical evidence corroborating Claimant's subjective complaints of functional

limitations, the noncompliance in medical treatment, and the testimony adduced at the hearing. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ then addressed several inconsistencies in the record to support her conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician stated that Claimant was disabled or unable to work during the relevant time period. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical

basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on his daily activities, or functional or physical limitations. Further, the ALJ noted that despite his allegations of persistent pain, Claimant has not received ongoing medical attention or treatment for his pain. Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints."); See Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997) (determining that failing to seek treatment was inconsistent with claimant's subjective complaints of disabling pain); Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993) (lack of ongoing treatment is inconsistent with complaints of disabling condition). Likewise, the medical evidence is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment although Claimant testified otherwise at the hearing. See Id.; Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility). The ALJ also noted that Claimant was not compliant with treatment recommendations on occasion. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility.").

At the hearing, Claimant testified that he stopped working because he was laid off, not because of his impairments but in a treatment note he reported to Dr. Williams that he was released from work due to his constant pain and inability to do tasks he used to be able to do. Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a

factor to consider in determining claimant's credibility). Next, the ALJ noted how Claimant had

applied for and received unemployment benefits after being laid off in May, 2005, from his last

position. The ALJ found by applying for unemployment benefits, thereby holding himself out as

able to work, detracted from his credibility. The application for unemployment benefits requires

an assertion of the ability to work and is facially inconsistent with a claim of disability. Cox v.

Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir.

1994). Further, the ALJ noted how by his own admission, Claimant is able to engage in

household chores and activities. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The

ALJ may discount subjective complaints of physical and mental health problems that are

inconsistent with medical reports, daily activities, and other such evidence."). The ALJ opined

these to be consistent with light work. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996)

(affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to

care for one of his children on a daily basis, drive car infrequently, and go grocery shopping

occasionally). Further, the ALJ noted that Claimant was able to sit for almost forty-five minutes

with no visible signs of distress and no problems getting up from the chair at the hearing. Johnson

v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (appropriate for ALJ to consider personal

observations made during hearing when determining credibility of claimant). These observations

are supported by substantial evidence on the record as a whole.

Moreover, the relevant evidence the Appeals Council made part of the record after the

hearing, Claimant's Medical History, does little to challenge the ALJ's credibility determination.

"In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the

record includes that evidence submitted after the hearing and considered by the Appeals Council."

Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994) ("[The court] must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing.").

In the instant case, the additional evidence further belies Claimant's credibility. At the hearing, and under oath, Claimant acknowledged the inconsistency in his seeking disability while having been awarded unemployment benefits. The ALJ questioned the inconsistency in presenting himself as ready, willing and able to work to the State of Missouri for unemployment benefits while at the same time seeking benefits as of May, 2005, for total disability. Claimant acknowledged the inconsistency in his testimony and acknowledged how this would reflect on his credibility.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support her finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making her credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).

Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before her and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's minimal, ongoing medical treatment, his lack of functional restrictions by any physicians, his daily activities, lack of objective medical evidence, noncompliance with recommended treatment, and the hearing testimony. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits

was not indicative of severe pain).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that Claimant's complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal the questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this   17th   day of July, 2008.

                        /s/ Terry I. Adelman
                  UNITED STATES MAGISTRATE JUDGE